## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

JACOB STERNBERG,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER;
DEBORAH DILLEY, a Commander with the Denver Police Department, in her individual capacity;
JOHN DOE, whose true name is currently unknown, in his individual capacity;
ANTHONY FOSTER, a Sergeant with the Denver Police Department, in his individual capacity; and
ANTHONY MARTINEZ, a Sergeant with the Denver Police Department, in his individual capacity,

      Defendants

---

## COMPLAINT AND JURY DEMAND

---

## I. INTRODUCTION

1.   On the evening of August 25, 2009, during the Democratic National Convention, a solid line of riot-equipped police shut down a protest march as it proceeded on 15th Street and the adjoining sidewalks in downtown Denver. A second line of police quickly closed in from behind, confining hundreds of persons in a one-block stretch of 15th Street between Court and Cleveland.

2.   The encircled group included participants who had been walking legally on the public sidewalks as well as persons who had been marching in the street without the required permit. It also included legal observers, curious onlookers, members of the press, and other nonparticipants.

3.   The City of Denver then carried out an arbitrary and groundless mass arrest, without probable cause, of 96 individuals, including the Plaintiff in this case, Jacob Sternberg. Arrestees including Mr. Sternberg were locked into a holding cell at a Denver warehouse that had been converted into a detention facility for DNC-related arrests. At that detention facility, Denver refused to allow attorneys to meet with or speak with any of the arrestees.

4.   Jacob Sternberg was falsely arrested and forced to defend himself in court proceedings from groundless accusations of criminal conduct. He was charged with Interference and Obstructing Passage, and Refusing an Order from an officer. After Denver eventually acknowledged that no such order had ever been issued, Denver nevertheless persisted in prosecuting the Plaintiffs for "obstruction" of a public right of way by allegedly marching in the street without a permit.

5.   Despite a lack of evidence, The City of Denver insisted on prosecuting Mr. Sternberg, and on January 14, 2009, the Court acquitted him.  Mr. Sternberg now files this action seeking compensation for the violation of his constitutional and statutory rights. Pursuant to the federal civil rights statute, 43 U.S.C. § 1983, Mr. Sternberg seeks compensatory and punitive damages for violation of his rights under the First and Fourth Amendments. Pursuant to a Colorado statute that requires jailers to allow arrestees to meet with attorneys, C.R.S. § 16-3-404, Mr. Sternberg seeks statutory penalties.

## II. JURISDICTION AND VENUE

6.   Jurisdiction over the subject matter of this action is vested in this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This action arises under the United States Constitution and Federal laws, including 42 U.S.C. § 1983 and 1988, and the laws of the State of Colorado.

7.   Venue is proper in this district under 28 U.S.C. 1391(b)(1), and (b)(2).

## III. PARTIES

### A. Plaintiff

8.   At all times relevant to this complaint, Jacob Sternberg ("Plaintiff" or "Mr. Sternberg") was 31 years old and lived in Oregon and California. Plaintiff attended the University of Texas at Austin and is an engineer. On August 25, 2008, Mr. Sternberg was wrongfully arrested and imprisoned while Denver was hosting the Democratic National Convention ("DNC").

### B. Defendants

9.   Defendant City of Denver ("Denver") is a home rule municipality pursuant to Article XX of the Colorado Constitution. It operates the Denver Police Department ("DPD") and the Denver Sheriff Department ("DSD"). At all times relevant to this complaint, Defendant operated a detention facility it called the Temporary Arrestee Processing Site or "TAPS," which was used for the custody of persons arrested in Denver during the DNC. The TAPS facility was staffed by Denver employees. DPD and DSD officers, including Defendants Dilley, Doe, Foster and Martinez, are Denver's employees and agents. During the DNC, Denver contracted with other jurisdictions to provide law enforcement officers during the DNC. At all time periods relevant to this Complaint, officers of other jurisdictions operating in Denver during the DNC were Denver's agents and are included in any reference to "Denver's officers."

10.  At all times relevant to this Complaint, Defendant Deborah Dilley was a DPD commander. Plaintiff sues Defendant Dilley in her individual capacity.

11.  At all times relevant to this Complaint, Defendant Doe was a Denver DPD or DSD supervisor or officer or an employee of the Manager of Safety. Defendant Doe may be more than one person, and/or may be one or more of the named defendants. Plaintiff will amend the complaint to reflect Defendant Doe's true name or names upon further discovery. Plaintiff sues Defendant Doe in his/her individual capacity.

12.  At all times relevant to this Complaint, Defendant Anthony Foster was a DPD sergeant. Plaintiff sues Defendant Foster in his individual capacity.

13.  At all times relevant to this Complaint, Defendant Anthony Martinez was a DPD sergeant. Plaintiff sues Defendant Martinez in his individual capacity.

14.  At all times relevant to this complaint, the individual Defendants were acting under color of state law and pursuant to Denver's policies, procedures, customs and practices.

## IV. FACTUAL ALLEGATIONS

### A. Denver and Its Officers Caused Plaintiff's Wrongful Arrest – The Events at Civic Center Park.

15.  Civic Center Park is Denver's oldest and most centrally-located public park in Denver. The park is situated in the middle of Denver's major public transit centers, Denver's business and shopping district on the 16th Street Mall, the Colorado State Capitol Building, Denver's City and County Building, Denver's public library, the Colorado Supreme Court, Denver's art museum, and dozens of other office buildings and residences.

16.  The area is known as the center of the civic life in the city, with numerous institutions of arts, government, and culture as well as numerous festivals, parades, and protests throughout the year. The park is home to many fountains, statues, and formal gardens, and includes a Greek amphitheater, a war memorial, and the Voorhees Memorial Seal Pond.

17.  During the DNC, Civic Center Park was a hub of activity. People utilized the park for a variety of planned events, such as speeches, trainings, teach-ins, serving free food, and musical concerts. The park was also used during the DNC as a public gathering place and as a place to rest and relax.

18.  On Monday, August 25th, 2008, numerous events were planned at Civic Center Park. A "music showcase" from 3 p.m. to 10 p.m. was advertised featuring musicians, poets and speakers. Free food and drink were being served to hundreds of people. Several teach-ins were planned for the late afternoon. A demonstration at the U.S. Mint was planned for 5 p.m., with participants leaving from and returning to Civic Center Park. A group calling

itself Unconventional Action advertised a march to begin at 6 p.m. from Civic Center Park.

19.  On the afternoon and early evening of August 25, 2008, these various events drew thousands of people to Civic Center Park. These events drew participants, as well as spectators, curious onlookers and others. These events also drew dozens of members of the international, national, local and independent press, and informal documentarians and observers interested in recording the historic events in downtown Denver during the national convention.

**B. Denver's time, place and manner restrictions for marches.**

20.  Denver's city streets are traditional public forums. In some cases, Denver imposes time, place and manner restrictions on the use of public streets for expressive activity by requiring a permit for a march in city streets.

21.  In practice, however, Denver has waived this requirement and allowed certain marches to occur in city streets when no permit has been obtained.

22.  Pursuant to Denver's unwritten practice of waiving the permit requirement for certain marches, law enforcement officers will close down the street to vehicles in order to allow the unpermitted march to proceed safely in the streets.

23.  For example, in the spring of 2006, tens of thousands of people marched in Denver's streets to express their opinions on immigration policies. Denver did not make any arrests, despite the fact that there was no permit.

24.  Denver also waived the permit requirement during the DNC. For example, on August 27, 2008, Denver's law enforcement officers closed major downtown thoroughfares to allow a march by a group called Iraqi Veterans Against the War. Denver's officers did not arrest persons marching in the street, even though they did not have a permit.

25.  Just hours before the march that is the subject of this Complaint, a group of individuals marched on the streets and on the sidewalks from Civic Center Park to the U.S. Mint without a permit. Denver's officers allowed the march to proceed without making any arrests.

26.  Though Denver requires a written permit for street marches, Denver has no such requirement for marches that occur on public sidewalks. Prior to the DNC, Denver widely advertised that no permit was required to march on Denver's public sidewalks.

27.  Shortly after 7 p.m. on August 25, 2008, a march began in Civic Center Park. The marchers left Civic Center Park from the Greek Amphitheatre and marched down 15th Street toward Court Place. The marchers did not have a permit. Some of the marchers were in the street; others marched only on the sidewalks.

28.  As the march began, it was followed by members of the media documenting the event, as well as informal documentarians, legal observers, curious onlookers, and others. People nearby also included bystanders, such as persons working, staying or commuting downtown, who merely happened to be in the area when the march began.

29.  Defendants had various options for managing the march once it began. For example:

    a.  Denver could have waived the permit requirement and allowed the march to continue, as Denver had done in the past with other marches, and made arrests only if and when a particular individual attempted some illegal act other than marching;

    b.  Denver could have directed its officers to encircle and detain only those persons who were marching in the street, while allowing those on the sidewalks to continue marching and/or observing from the sidewalks where no permit was required;

    c.  Denver could have broadcast an order instructing everyone marching in the street to move onto the sidewalks or face arrest;

    d.  Denver could have broadcast a dispersal order instructing everyone in the area, including those lawfully on the sidewalks, to leave the area immediately or face arrest.

30.  Instead, however, Denver elected to trap and detain the entire crowd of hundreds of persons, including those who had never marched in the street.

31.  The march proceeded toward Court Place.

32.  Plaintiff Jacob Sternberg never participated in the march in the street.

33.  Plaintiff Jacob Sternberg was merely walking from Civic Center Park to Downtown Denver, always utilizing crosswalks and sidewalks, never entering the street.

34.  As marchers, media, curious onlookers and others neared Court Place, their path was blocked by a solid line of Denver's officers that extended across 15th Street, blocking passage on the sidewalks as well as the street.

35.  Another group of officers quickly swept in from the southeast and formed another police line behind those nearing Court Place.

36.  More officers arrived quickly. Within a matter of minutes, officers had formed two roughly parallel police lines, each of which extended from the Wellington Webb Building, across 15th Street, to the Sheraton Hotel.

37.  Hundreds of persons were detained between these police lines, and they were not free to

leave.

38.  Plaintiff was detained between these police lines, and he was not free to leave.

39.  For purposes of the Fourth Amendment, Denver had seized all of these individuals, including Plaintiff.

40.  The hundreds of individuals detained between these two police lines included persons who were marching in the street, persons who were marching on the sidewalks, members of the media, documentarians, observers, curious onlookers, and others.

41.  Plaintiff had never marched in the street (excluding crosswalks).

42.  At all times Plaintiff listened intently for an order of dispersal.

43.  Plaintiff did not ignore any lawful order.

44.  Prior to the seizure, no Denver officer had told persons on the sidewalks they could not lawfully continue to march, observe, or simply be present on the sidewalk.

45.  Plaintiff remained on the sidewalk on Court Street and did not voluntarily enter the street.

46.  Prior to the Seizure, no Denver officer had told Jacob Sternberg that he could not lawfully walk, observe, or simply be present on the sidewalk.

47.  Prior to being seized by Denver's officers, the Plaintiff was never ordered to leave the sidewalks or to disperse from the area.

48.  Although individuals were not permitted to exit the police lines, they were free to move between the street and the sidewalks inside of the police lines.

49.  Persons who had not previously been marching in the street, including Plaintiff, quickly became intermixed with those who had, as people moved around inside of police lines.

50.  Within a short amount of time, it was often not possible to distinguish those persons who had previously been marching in the street from everyone else who Denver had seized.

51.  For example, people previously standing only on the sidewalk walked into the street to ask officers for permission to leave, or to look for a place exit police lines.

52.  In addition, members of the press and observers detained inside of the cordon moved from the sidewalks into the street to document and record the events unfolding inside of police lines.

53.  Denver's own officers ordered individuals to move from the sidewalk onto the street.

54. Denver's officers also physically forced individuals off of the sidewalk onto the street with their batons and hands, or by advancing police lines pushing groups off the sidewalk and into the street.

55. Denver's officers physically forced Plaintiff Jacob Sternberg off of the sidewalk onto the street.

56. Before being pushed onto the street, Plaintiff never stepped foot onto the street.

57. Denver's officers also deployed projectile weapons and OC (pepper) spray into the crowd, often without any prior warning, causing people to move haphazardly in various directions inside of the police lines to avoid being subjected to use of those weapons. For example, Denver's officers deployed torrents of OC spray haphazardly into the crowd to assist uniformed officers in removing from the detained group an undercover officer, who was posing as a protestor. This caused people to move in all directions inside of the police lines.

58. After the initial seizure, Denver's officers formed additional police lines and gradually constricted and redefined the area in which the seized group was being held.

59. Plaintiff asked officers on more than one occasion if a dispersal order was to be given and if there would be an opportunity to leave.

60. Plaintiff asked the officers why he was being detained, and received no response.

61. Plaintiff was told by an officer that a dispersal order would be given.

62. Plaintiff was never given any opportunity to voluntarily exit the police lines after their seizure of him.

**C. Denver and its Officers Force Plaintiff into Street then Arrest him for Being in the Street**

63. Plaintiff was standing on the sidewalk when he was seized.

64. He was still standing on the sidewalk when an officer put his baton against his back and shoved him toward the street.

65. The officers formed a line parallel with the back edge of the sidewalk and advanced toward the street, forcing everyone, including Plaintiff, off of the sidewalk and into 15th Street.

66. Defendant Martinez testified under oath that he witnessed the encirclement of the people in the street, and that none of his team moved any people from the sidewalk to the street.

67.  Defendant Martinez was incorrect.

68.  Plaintiff was ultimately ordered by officers to sit down in the street.

69.  Denver's officers arbitrarily divided the single large crowd into smaller groups.

70.  Ultimately, the two distinguishable groups of individuals that were detained were one group next to the Wellington Webb building, and another next to the Sheraton Hotel.

71.  At the time that officers divided the group into two, there was no way to determine which persons had previously been marching in the street, and which persons, like the Plaintiffs, had not been marching in the street.

72.  The group detained near the Sheraton Hotel was initially told that they were going to be released.

73.  No officer could or did say that they saw Plaintiff marching in the street.

74.  Denver's officers, including Defendant Martinez, ordered everyone to get out an "ID" and to hold it up. He announced that everyone would be released one-by-one through a designated exit in the police line.

75.  Almost immediately after this instruction by Defendant Martinez however, the order was reversed and everyone was ordered to sit back down.

76.  Defendant Martinez was in control of officers who had seized the group of approximately 100 persons near the Sheraton Hotel.

77.  Defendant Martinez later testified under oath in criminal proceedings that he knew it was possible there were innocent persons who had never marched in the street among the group he was detaining.

78.  However after Defendant Martinez testified under oath that he knew it was possible that there were innocent persons who had never marched in the street among the group he was detaining, he testified in Plaintiff's criminal trial that that he witnessed the encirclement of the people in the street, all the people encircled were violators of the law and "the obvious people that were not going to leave the street areas."

79.  Defendant Martinez was right. The group seized near the Sheraton Hotel included many individuals, such as the Plaintiff, who had not marched in the street and who were guilty of nothing more than being closer to one side of 15th Street than the other when Denver officers arbitrarily subdivided the large group into two smaller ones.

80.  The fact that the group detained near the Sheraton Hotel included persons who had not been marching in the street was obvious to everyone at the scene, including the Defendants.

81.  Plaintiff's arresting officer, Paul Campbell, had no knowledge of anything Plaintiff did or did not do before he arrested him.

82.  Officer Campbell was not aware of Plaintiff breaking any law or violating any police order before he arrested him.

83.  Nonetheless, Denver police arrested the entire group that was detained next to the Sheraton Hotel, including Plaintiff Sternberg.

**D. Officers Make False Statements in the Affidavits Supporting Plaintiff's Warrantless Arrest.**

84.  Plaintiff was "processed" at the site of the arrest, near the Sheraton Hotel, before being taken to the TAPS facility.

85.  Plaintiff was paired up with an "arresting officer" or officers who completed the arrest paperwork.

86.  The "arresting officer" completed two sworn affidavits -- a written affidavit that was included on the ticket and summons, and an oral affidavit recorded on a handheld video camera.

87.  The statements made by the Plaintiff's "arresting officers" in these affidavits were universally and materially false.

88.  The "arresting officers" consistently swore that the group of people Plaintiff was with was marching in the street;

89.  The "arresting officers" consistently swore that Defendant Foster audibly ordered them to disperse and that the Plaintiffs ignored these orders to disperse.

90.  In fact, neither Defendant Foster nor any other officer ever broadcast any dispersal order at any time.

91.  The officer making a statement of probable cause for the arrest of Plaintiff stated that during the Democratic National Convention, the Plaintiff was "contacted by police and arrested for:  Sgt. Foster gave 3 lawful commands to disperse sus did not leave and was placed into custody without incident." (sic)

92.  The statement made in paragraph 91 was false.

93.  This falsification of grounds for probable case was not isolated since officers also made false statements in their affidavits regarding other arrestees that were at the scene.

94. Some officers' false statements in various affidavits also included invented details regarding the "dispersal order" which was never actually given. For example, Ms. Tiffany Bray's "arresting officers" swore that, "At 19:30 hours, Sgt. Foster of Denver PD gave a lawful order to disperse. [Bray] ignored 3 requests by police to leave. [Bray] refused, and was then arrested." Plaintiff Hardy's arresting officer swore that Plaintiff Hardy "was given an order to disperse by Sgt. Foster…The dispersal order was given at 1930 by Sgt. Foster—[Arrestee Eli Hardy] didn't comply." Arrestee Aminah Masud's "arresting officer" swore that, "[Masud] was in a crowd that was given a dispersal order by Sgt. Foster. The order was given verbally three times, the crowd refused to disperse. [Masud] was among the crowd at which time a mass arrest was ordered."

95. Defendant Doe instructed the "arresting officers" to include these false statements in the affidavits, in order to manufacture evidence justifying Plaintiff's warrantless arrest.

96. Defendant Doe knew that these statements were false or acted with reckless disregard for the truth of these statements.

**E.   Denial of Right under Colorado Law to Consult with an Attorney.**

97. The Plaintiff was transported to the TAPS facility, where he was imprisoned.

98. Colorado Revised Statute ("C.R.S") § 16-3-404 requires that law enforcement officers permit an individual held at any "place of custody" to consult alone and in private with an attorney who arrives at the place of custody to consult with that person.

99. Shortly after the arrests were made on the night of August 25, 2008, attorneys went to the TAPS facility in order to consult privately with the Plaintiff and the others arrested with him.

100. Plaintiff Mr. Sternberg wished to consult privately with an attorney.

101. Plaintiff Mr. Sternberg expressed his desire to consult an attorney.

102. Defendant Denver pursued a policy to refuse attorneys access to meet those incarcerated.

103. Pursuant to this policy of Defendant Denver, DSD employees refused to allow the attorneys access to meet with the Plaintiff or any of the other persons held at the TAPS facility.

**F. Plaintiff is Acquitted of the Charges Against him.**

104. The Plaintiff was initially charged with violating Denver Revised Municipal Code ("DRMC") § 38-31, "Interference with police authority," DRMC § 38-31(c) "Disobedience to a Lawful Order," and DRMC § 38-36, "Obstruction of streets or other public passageways."

105. After their arrest, Plaintiff spent August 25 to August 27, 2008 in custody before being released on bond.

106. After release, the Plaintiffs had to abide by the conditions of his bond, retain attorneys to represent him, and begin preparing to defend himself self against Denver's criminal prosecution.

107. During the initial criminal prosecutions against others arrested at the scene, including those sitting immediately next to Plaintiff, the Defendants admitted that no dispersal order was ever given on August 25, 2008.

108. Subsequent to that admission, all charges except DRMC § 38-36, "Obstruction of streets or other public passageways" were dropped.

109. Before and during the criminal prosecutions, including the trial against the Plaintiff, Denver was unable to produce a single piece of evidence or a single witness that implicated the Plaintiff in the alleged criminal acts.

110. After a trial, the Plaintiff was acquitted by the Court on January 14, 2009.

## V. DENVER'S POLICIES, PRACTICES AND CUSTOMS

### A.  Denver Policymakers are Aware of the Risk of Wrongful Arrests During Mass Arrest Situations.

111. There is an obvious risk that when law enforcement officers confront a mixed crowd that includes both the innocent and guilty alike, officers will wrongfully arrest persons if they simply arrest en masse everyone who is present at the scene.

112. The risk is particularly obvious in the case of an unpermitted march in city streets, where innocent persons such as members of the media, sidewalk participants, observers, curious onlookers and bystanders may be lawfully present mere feet away from those who are breaking the law by marching without a permit.

113. Denver was aware of the substantial risk that its officers would wrongfully arrest persons during unpermitted marches if law enforcement officers did not engage some mechanism to distinguish between individuals who were marching in the street and other persons in the immediate vicinity who were not participating in the march.

114. These risks were obvious to Denver's highest policymakers from past experience.

115. Denver was aware that unpermitted marches in Denver were frequently attended and observed by the media, lawful sidewalk participants, legal observers, and others.

116. Denver was aware that if its officers had simply decided to arrest everyone en masse in the vicinity of these past marches, the arrests would have certainly swallowed up people who were not breaking the law by marching in the street.

117. Denver and its highest policymakers were aware of other instances prior to the DNC when the failure to properly distinguish between individuals who were lawfully present and those whom police believed had marched in the streets resulted in the wrongful arrest of innocent participants, observers and bystanders swept up in mass arrests.

**B. Denver's Deliberately Indifferent Failure to Adopt Adequate Policies and Training Caused Plaintiff's Injuries.**

118. Despite this obvious risk, for marches such as the one that prompts this Complaint, Denver did not have meaningful policies or procedures that its officers were required to follow to distinguish between alleged lawbreakers and innocent persons.

119. Denver knew well in advance of August 25, 2008, that "marches" were planned during the DNC.

120. Denver knew in particular that an unpermitted street march was planned for the evening of August 25, 2008, and Denver planned and prepared for the event.

121. Denver knew that if the march occurred as planned, there would be innocent persons in the immediate vicinity of persons marching in the street.

122. Denver knew that unless it required and trained its officers to distinguish between people marching in the street and people who were not marching in the street, there was a significant risk that officers would make wrongful arrests.

123. Nevertheless, Denver failed to adopt adequate policies or procedures, and failed to adequately train its officers.

124. As a direct result, Defendants did not give a dispersal order or invoke any reliable mechanism to distinguish between people who had been marching in the street, and those who had not, prior to arresting en masse the entire group detained near the Sheraton Hotel.

125. As a direct and foreseeable result of this lack of adequate policies and training, Defendants treated the entire group of individuals detained near the Sheraton Hotel as a homogenous unit.

126. Defendants simply arrested everyone in the group, including Plaintiff, despite the fact that there was not probable cause to believe that each individual had been violating the law.

**C. Decisions by Denver's Final Policymaking Officials Caused Plaintiffs' Injuries.**

127. In addition, the decisions of Denver's final policymaking officials made on August 25, 2008, established Denver's municipal policy and caused the violation of the Plaintiffs' constitutional rights.

128. During the march, Denver's final policymaking officials watched the events unfold remotely and were in communication with officers and supervisors on the scene.

129. During the march, Denver's final policymaking officials watched the events unfold remotely and were in communication with Defendant Dilley.

130. Denver's final policymakers were aware of the facts alleged in this Complaint.

131. After Denver's officers had initially seized the group, but before Denver's final policymaking, officials ratified and approved the decision to arrest the entire group next to the Sheraton Hotel.

132. After Denver's officers had initially seized the group, but before Denver's final policymaking, there was ample time for consideration, deliberation and review.

133. Denver's final policymakers ratified and approved the decision of Denver officers to arrest en masse the group detained near the Sheraton Hotel.

134. Denver's final policymaking officials made a deliberate choice among various policy alternatives when deciding what course of action to take with regard to the mixed group seized near the Sheraton Hotel.

135. Those choices included, but were not limited to directing officers to arrest only those persons whom a specific officer actually witnessed marching in the street, and to release the remaining persons.

136. Those choices included, but were not limited to directing officers to wait to allow the situation to defuse, and then to release all individuals from the detained group one-by-one without making arrests.

137. Those choices included, but were not limited to directing officers to broadcast a dispersal order and open an exit in the police lines, and then arrest individuals who remained in the area after being given an opportunity to leave, in violation of the dispersal order.

138. Instead, after rejecting various alternatives which would have posed little or no risk of wrongful arrest, Denver's final policymaking officials ratified and authorized the en masse arrest of all the individuals detained near the Sheraton Hotel, including the Plaintiff Mr. Jacob Sternberg.

139. Denver did so despite the certainty that arresting the entire group would cause the wrongful arrest of persons who had never marched in the street.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF - First and Fourth Amendments, 42 U.S.C. § 1983
### (Against Defendants Denver, Doe, Dilley, Foster, and Martinez)

140. Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 139 above as if fully set forth herein.

141. The First Amendment protects the right of an individual to assemble.

142. The First Amendment protects the right of an individual to observe and/or record public events, including the right to record and observe the actions of law enforcement officers.

143. The right to observe and record law enforcement officers is protected by the First Amendment regardless of whether the individual is a credentialed member of the press, a trained legal observer, an amateur documentarian, or merely a curious onlooker.

144. Prior to their seizure of him, the Plaintiff was lawfully present in public forums observing the public actions of law enforcement officers.

145. Once Plaintiff was detained between police lines and was no longer free to leave, he had been seized for purposes of the Fourth Amendment.

146. The Fourth Amendment requires probable cause to make a warrantless arrest.

147. The Plaintiff's warrantless arrest was not based upon probable cause to believe that he had violated the law.

148. In fact, no law enforcement officer could testify at Plaintiff's criminal trial that Plaintiff was observed doing anything against the law on the day in question.

149. Defendants Dilley, Doe, Foster, and Martinez made the decision to arrest the arrestees, including the Plaintiff, and caused the violation Plaintiff's First and Fourth Amendment rights.

150. This decision to arrest was ratified and approved in advance by Denver's final policymaking officials.

151. Defendants knew that no dispersal order had been given.

152. The Defendants knew that there was not probable cause to arrest any individual for refusing to obey a dispersal order which had never been given.

153. The Defendants knew there was no legitimate basis for instructing "arresting officers" to

effectuate warrantless arrests based upon the manufactured evidence recorded in the probable cause affidavits.

154. Officer Campbell, the arresting officer, was not aware of a legitimate basis to arrest Plaintiff.

155. The Defendants knew that that not everyone in the group detained near the Sheraton Hotel had been marching in the street.

156. After the initial seizure of the Plaintiff but before the decision to arrest them was made, there was ample time for any of the individual Defendants to intervene and prevent the violation of the Plaintiffs' constitutional rights, but they failed to do so.

157. A reasonable officer in Defendants' position would have known that their actions violated clearly established law.

158. In causing the arrest of the Plaintiff, Defendants were acting pursuant to Denver's policies, procedures, customs and practices.

159. Denver, through its policies, procedures, customs and practices, and through its deliberately indifferent failure to develop adequate policies, procedures and training, caused the violation of the Plaintiffs' constitutional rights.

160.  Plaintiff is entitled to compensatory and punitive damages from Defendants Dilley, Doe, Foster, and Martinez; compensatory damages from Defendant Denver; attorney's fees pursuant to 42 U.S.C. § 1988 and all applicable law; and any additional relief the Court deems just.

### SECOND CLAIM FOR RELIEF -
### Colorado Law, C.R.S. § 16-3-404

161.  Plaintiffs hereby incorporate the allegations set forth in paragraphs 1 through 160 above as if fully set forth herein.

162.  Plaintiff Jacob Sternberg wished to consult with an attorney while he was in Denver's custody at the TAPS facility.

163.  Under Colorado law, Plaintiff had the right to consult with an attorney, alone and in private, when an attorney came to meet with him at the TAPS facility.

164.  Defendant Denver denied Plaintiff's right to consult with an attorney while Plaintiff was in Defendants' custody at the TAPS facility.

165.  Defendant Denver is liable to Plaintiff for a statutory penalty of up to $1,000, pursuant to

C.R.S. § 16-3-404.

WHEREFORE, Plaintiff prays for relief as follows:

(a) compensatory and punitive damages pursuant to 42 U.S.C. § 1983 against Defendants who are sued in their individual capacity;

(b) compensatory damages from the City and County of Denver;

(c) statutory penalties from defendants who are sued pursuant to Colorado law;

(d) an award of Plaintiffs' reasonable attorney's fees and costs of this action, pursuant to 42 U.S.C. § 1988 and any other applicable law;

(e) Pre- judgment and post-judgment interest; and

(f) any additional relief the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL ON ALL OF HIS CLAIMS.

DATED at Denver, Colorado this, 18th day of March 2010.

/s Wadi Muhaisen
_____
Wadi Muhaisen, Esq. #34470
The Law Office of W Muhaisen P.C.
1435 Larimer St., Ste. 203
Denver, CO 80202
Ph: (303) 872-0084
Fax: (303) 558-4128
wadi@muhaisenlaw.com

Plaintiff's Address

836 57th Street
Oakland, CA 94608